Filed 3/9/23  P. v. Norman CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B318560 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA031863) |
| v. | |
| DANIEL MONROE NORMAN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Judith L. Meyer, Judge.  Affirmed.

Sandra Gillies, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Daniel Norman (defendant) was convicted of murder in 1997 when he and a friend conducted an armed robbery of a drug supplier's apartment. In 2019, defendant sought to vacate his sentence under Penal Code section 1172.6 (former section 1170.95).[1] After holding an evidentiary hearing, the trial court denied the petition because it found, beyond a reasonable doubt, that defendant had acted with reckless indifference to human life (defendant conceded that he was a major participant in the robbery). Defendant argues that the trial court's finding was not supported by substantial evidence. He is incorrect, so we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.     Facts[2]

#### A.     *The underlying crime*

In early April 1997, defendant and Bobby Renfroe Jr. (Renfroe) conducted a home-invasion robbery of Jeff Perry (Perry), whom they believed to be involved in selling illegal drugs. Renfroe self-identified as a member of the Dodge City

---

[1]     Effective June 30, 2022, section 1170.95 was renumbered section 1172.6 (Stats. 2022, ch. 58, § 10). For simplicity's sake, we will refer to the section by its new numbering only.

All further statutory references are to the Penal Code unless otherwise indicated.

[2]     We draw the facts from our review of the trial transcript.

2

Crips, and defendant was "associated" with the same gang.

Prior to the robbery, defendant and Renfroe questioned a friend who was a known drug user about where Perry, as his supplier, lived with his fiancée and their son. When they were a block away from Perry's apartment, defendant and Renfroe put on ski masks to cover their faces and armed themselves—Renfroe with a .38 revolver and defendant with an Uzi. They encountered Perry's fiancée on the stairs just outside Perry's apartment; Renfroe kept walking, but defendant grabbed her, put his Uzi to her head and warned her, "Don't scream."

While defendant was holding the fiancée at gunpoint, Renfroe entered the apartment. Upon entering, he encountered a man—later identified as Giacomo Candela (Candela)—in the apartment's front room and shot him in the chest. After the shot was fired, the fiancée ran away and defendant stepped into the apartment's front room. Hearing the shot, Perry emerged from the apartment's back rooms. Walking past Candela's prone form on the floor, defendant put his Uzi to Perry's head and demanded that Perry give him the money in his safe. Perry led defendant and Renfroe to a safe, which contained $4,800 in cash and a loaded gun.

One of the two robbers then pushed Perry to the ground and demanded to know where the "other money" was. They pulled Perry up, said, "Let's go," and started pushing Perry toward his Jeep in a nearby parking lot. Perry managed to escape after defendant and Renfroe climbed into the Jeep before Perry, and Perry locked the doors and ran.

Defendant and Renfroe got out of the Jeep and gave chase. When they were unable to catch Perry, they went to a friend's house to count the cash they got from Perry's safe.

Candela died from the gunshot wound a few hours later.

**B.    *Charges, conviction and appeal***

The People charged defendant and Renfroe with (1) the murder of Candela (§ 187, subd. (a)), (2) first degree residential robbery (§ 211), (3) assaulting Perry's fiancée with a firearm (§ 245, subd. (a)(2)), and (4) first degree residential burglary (§ 459).[3]  The People also charged defendant with being a felon in possession of a firearm (former § 12021, subd. (a)(1)).  The People alleged the special circumstance that the murder occurred during the commission of the residential burglary and residential robbery (§ 190.2, subd. (a)(17)); alleged that defendants personally used a firearm during the commission of the offenses (§ 12022.5, subd. (a)(1)); and alleged, as to the robbery and burglary counts, that defendants personally inflicted great bodily injury (§ 12022.7, subd. (a)).

The jury found defendant guilty of all charges, and found true all allegations.

The trial court sentenced defendant to life without the possibility of parole (for the murder and special circumstance) plus 31 years in state prison (for the remaining counts).

Defendant appealed, and we affirmed the judgment in an unpublished opinion.

**II.    Procedural Background**

In August 2019, defendant filed a petition seeking to vacate his murder conviction under section 1172.6 on the ground that he was not the actual killer, did not aid and abet the actual killer, and was not a major participant in the robbery who acted with

---

[3]    The People also charged defendant with a second count of first degree residential robbery, but dismissed that count prior to trial.

4

reckless indifference to human life.

In February 2022, and after appointing counsel for defendant, the trial court held an evidentiary hearing regarding defendant's eligibility for relief under section 1172.6.  Neither the People nor defendant presented any new evidence.  The sole issue was whether, in the trial court's independent judgment, the special circumstance finding was true:  Defendant conceded he was a "major participant," but argued that he did not act with "reckless indifference to human life" in committing the robbery and burglary.

The trial court denied defendant's petition.  Specifically, the court found, beyond a reasonable doubt, that defendant had acted with reckless indifference to human life because (1) defendant knew guns would be used to commit the robbery and burglary, was armed himself, and twice pointed his Uzi at people's heads, (2) defendant was physically present at the scene of the robbery, and, when defendant entered the apartment after Renfroe shot Candela, opted to put his Uzi to Perry's head to demand money rather than stop to render aid to Candela, (3) the crime lasted several minutes from the time defendant and Renfroe approached the apartment, demanded Perry open his safe, and led Perry to his Jeep, and (4) although defendant did not know whether Renfroe had a tendency to be violent, defendant made no efforts to minimize the violence during the robbery and burglary.

Defendant filed this timely appeal.

## DISCUSSION

Defendant argues that the trial court erred in denying his petition to vacate his murder conviction and to resentence him under section 1172.6.

5

In 2018, our Legislature amended the definition of "murder" in our State to preclude a jury from "imput[ing]" the "malice" element of that crime "based solely on [a defendant's] participation in a crime." (§ 188, subd. (a)(3).) Our Legislature's purpose was to ensure that "[a] person's culpability for murder [is] premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1(g).) As amended, liability for murder is limited to persons (1) who are the actual killer, (2) who aided and abetted the actual killer in the murder (that is, who acted with the intent to kill), or (3) who were a major participant in the underlying felony that resulted in the killing, but only if they also acted with reckless indifference to human life. (§§ 188, subd. (a)(3), 189, subd. (e); e.g., *People v. Johns* (2020) 50 Cal.App.5th 46, 58-59.)

Section 1172.6 is the procedural vehicle by which persons convicted of murder in now-final judgments can seek to vacate convictions that do not satisfy the now-current definition of "murder." Where, as here, a defendant files a facially sufficient petition and the record does not otherwise foreclose relief as a matter of law, the trial court must issue an order to show cause and convene an evidentiary hearing. (§ 1172.6, subd. (c).) At the hearing, the People have the burden of proving to the trial court, as an independent factfinder, that defendant is guilty of murder under a still-valid theory. (§ 1172.6, subd. (d)(3).) The parties have the option of introducing "new or additional" evidence, or they may choose to rely on the record of the prior proceedings. (*Ibid.*)

The trial court in this case found beyond a reasonable doubt that defendant was guilty of murder under the still-valid theory that he was a major participant in the robbery that

6

resulted in Candela's death and that he acted with reckless indifference to human life. Defendant concedes that the court's finding that he was a major participant is supported by the record, but asserts that the finding that he acted with reckless indifference to human life is not. As a threshold matter, defendant argues that we must engage in de novo review of the evidence presented at trial, including reevaluating the credibility of witnesses and drawing whatever inferences we find persuasive; for support, he cites *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*). However, *Vivar* itself confined its rule of independent review for testimony presented in transcripts (rather than through in-person testimony) to petitions under section 1473.7 (*id.* at pp. 527-528 & fn. 7); not surprisingly, courts have uniformly rejected the argument defendant now advances (*People v. Clements* (2022) 75 Cal.App.5th 276, 302; *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232-233; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 590-591). We join that chorus. As a result, our task is simply to assess whether "substantial evidence"—that is, "evidence which is reasonable, credible, and of solid value"—supports the *trial court*'s independent finding that defendant acted with reckless indifference. (*People v. Nieber* (2022) 82 Cal.App.5th 458, 476.) In so doing, we view the evidence in the light most favorable to the court's finding, drawing all reasonable inferences in support of that finding. (*Ibid.*)

I.    **Pertinent Legal Principles**

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court more precisely defined when a person acts with "reckless indifference to human life."

Under *Banks* and *Clark*, a defendant acts with reckless indifference to human life when he "'"knowingly engag[es] in criminal activities known to carry a grave risk of death."'" (*Banks*, *supra*, 61 Cal.4th at p. 801, quoting *People v. Estrada* (1995) 11 Cal.4th 568, 577, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 157-158.) This standard "has a subjective and an objective" component. (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).) To satisfy the subjective component, "'[t]he defendant must be aware of and willingly involved in the violent manner in which the [underlying felony] is committed,' and . . . must consciously disregard 'the significant risk of death his or her actions create.'" (*Scoggins*, at p. 677, quoting *Banks*, at p. 801.) The key is whether the defendant evinces "a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) To satisfy the objective component, the risk of death "'"must be of such a nature and degree that, considering the nature and purpose of the [defendant's] conduct and the circumstances known to him . . ., its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the [defendant's] situation."'" (*Scoggins*, at p. 677, quoting *Clark*, at p. 617.)

Our Supreme Court has identified a number of considerations bearing on whether a defendant has acted with reckless indifference to human life. "No one of these considerations is necessary, nor is any one of them necessarily sufficient" (*Banks*, *supra*, 61 Cal.4th at p. 803); what matters is the totality of the considerations (*Scoggins*, *supra*, 9 Cal.5th at p. 677). The considerations are: (1) "Did the defendant use or know

that a gun would be used during the [underlying] felony," and, relatedly, "[h]ow many weapons were ultimately used?"; (2) "Was the defendant physically present at the crime," such that he had "the opportunity to restrain the crime or aid the victim?"; (3) "What was the duration of the interaction between the perpetrators of the [underlying] felony and the victims?"; (4) "What was the defendant's knowledge of his . . . confederate's propensity for violence or likelihood of using lethal force?"; and (5) "What efforts did the defendant make to minimize the risks of violence during the felony?" (*Ibid.*, citing *Clark*, *supra*, 63 Cal.4th at pp. 618-623.)

## II. Analysis

Substantial evidence supports the trial court's finding that defendant knowingly engaged in criminal activities known to carry a grave risk of death by evincing a willingness to kill that entailed a gross deviation from the standard of conduct that a law-abiding person would observe, and hence acted with reckless indifference to human life.

More generally, defendant and Renfroe engaged in conduct that carries with it a "particularly high risk of violence" because they executed "a home invasion robbery" of someone they knew to be a "drug dealer." (*In re McDowell* (2020) 55 Cal.App.5th 999, 1013 (*McDowell*).)

And more specifically, the pertinent *Banks* and *Clark* factors confirm that defendant in this case acted with reckless indifference to human life. Defendant knew that he and Renfroe would be using guns during the burglary and robbery, and defendant himself pointed his Uzi at the heads of both Perry's fiancée and Perry himself in order to get them to comply with his demands. Although defendant was not inside the front room of

9

Perry's apartment at the moment Renfroe shot Candela and hence may not have been able to stop that shooting, defendant certainly had the opportunity to aid Candela when defendant walked into the apartment moments after the gunfire and saw Candela on the floor; defendant's decision to step around Candela and point his gun at Perry's head—rather than render aid to the prone Candela—evinced a reckless indifference to human life. Although the interaction between Renfroe and Candela prior to Renfroe shooting him was brief, the burglary and robbery started at the time defendant put a gun the fiancée's head, and continued after the shooting as defendant put his gun to Perry's head, led Perry to his safe, waited for Perry to open the safe, threw Perry to the ground and demanded "the other money," followed Perry out to his Jeep, and then gave chase after Perry ran away. Defendant and Renfroe's time with Perry—while they were both armed and while Perry's apartment was littered with firearms[4]— only increased the risk to human life. Although there was no evidence that defendant had advance knowledge of Renfroe's penchant for shooting first and asking questions later, defendant certainly knew of it once he stepped past Candela's prone form moments after Renfroe shot him and yet defendant did nothing to minimize the risk of violence as their burglary and robbery continued; instead, defendant *elevated* the risk of violence by putting a gun to Perry's head. The totality of these circumstances supports our conclusion that substantial evidence

---

[4]    Perry had an affinity for guns; in addition to the loaded .45-caliber revolver he kept in the safe, he also had a Glock 9 mm. semiautomatic pistol on the refrigerator, and a .38 semiautomatic pistol on a shelf in the front room.

supports the trial court's finding that defendant acted with reckless indifference to human life.

## III. Defendant's Further Arguments

Defendant resists our conclusion with a panoply of arguments, which we are able to group into three different buckets.

### A. Banks *and* Clark *factors*

Defendant urges that none of the five *Banks* and *Clark* factors bearing on whether a defendant acted with reckless indifference to human life supports such a finding in this case.

First, defendant argues that he did not know that guns would be used because (1) he did not supply Renfroe with the gun Renfroe brought (and fired), (2) there is no evidence of any conversation between defendant and Renfroe about how they would use their guns during the home invasion robbery, (3) defendant never ended up firing his Uzi, (4) Renfroe later claimed that he only fired at Candela because he panicked, and (5) defendant later claimed (during one of his three conflicting statements to police) that his gun was a "fake Uzi" and was in fact, a "water gun." For support, defendant cites *In re Moore* (2021) 68 Cal.App.5th 434, 452-454 (*Moore*), which found no substantial evidence when a defendant did not supply or use a gun during a robbery. We are unpersuaded. Whether or not defendant supplied Renfroe with the .38 caliber Renfroe used, defendant was himself armed and himself pointed his gun at two different people—Perry's fiancée and then Perry. This case is therefore unlike *Moore*. Whether defendant and Renfroe discussed in advance a "plan" for the use of the guns is more pertinent to whether defendant was a "major participant" than whether he acted with reckless indifference; regardless of their

11

plan, defendant himself knew Renfroe had a gun and defendant controlled the Uzi he possessed—and his personal conduct in pointing that Uzi at multiple peoples' heads evinced a reckless indifference separate and apart from whatever defendant and Renfroe may have planned for Renfroe to do with his revolver. The fact that defendant did not end up shooting anyone does not negate the willingness to kill he evinced—not once, but twice—by putting his Uzi to two victims' heads. And the trial court was well within its discretion to reject as not credible Renfroe's and defendant's self-serving statements that Candela's shooting was a product of panic and that defendant was never really armed; it is not our job to second guess the trial court's credibility findings. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) Further, the circumstances of the robbery and burglary support the reasonable inference that the Uzi was real and loaded; indeed, both the drug user and Perry—as someone who regularly used firearms as part of their involvement in drug trafficking—identified defendant's gun as an Uzi (rather than a plastic replica of one).

Second, defendant argues that he was not physically present "at the crime" and had no opportunity to restrain Renfroe from shooting Candela because defendant was not in the apartment's front room when Renfroe fired at Candela. For support, defendant cites *Moore*, *supra*, 68 Cal.App.5th at p. 452; *In re Ramirez* (2019) 32 Cal.App.5th 384, 405; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 989-990; and *In re Taylor* (2019) 34 Cal.App.5th 543, 558-559. Defendant is right that he had no opportunity to stop Renfroe, but this does not mean defendant was unable to render aid: Although defendant was not in the front room and hence was not able to stop Renfroe from shooting

12

Candela, defendant entered that room moments later and stepped around Candela's prone form to continue the robbery by putting an Uzi to Perry's head. It is this latter failure to render aid that demonstrates defendant's reckless indifference. As a consequence, the cases defendant cites are all inapt because they involve situations where the felony had stopped by the time the defendant got to the scene; that is not the case here. Defendant protests it is inappropriate to count his treatment of Candela against him because (1) he did not know Candela was shot because most of the bleeding from the gunshot wound was internal, and (2) Candela would have died from the wound, even if defendant had stopped to render aid. We are unpersuaded. Whether or not the defendant saw blood, defendant walked into the front room seconds after hearing gunfire and found Candela on the ground; on these facts, the trial court could reasonably infer that defendant was aware that Candela had been shot as other inferences (such as Candela was instead napping on the floor) appear unreasonable. And whether defendant's aid would have *causally* mattered is irrelevant to whether defendant acted callously in stepping over a man who had just been shot so he could put an Uzi to another man's head. There is no evidence that defendant ignored Candela's body on the ground because defendant had, based on some medical training, determined that it was too late to render aid.

Third, defendant argues that the duration of interaction between himself, Renfroe and the victims was too short to reflect a reckless indifference because defendant only had a gun to the fiancée's head for a "matter of seconds" and because Renfroe shot Candela rather quickly. But this argument ignores the much more significant duration—which was part of this ongoing

burglary and robbery—during which defendant and Renfroe, with guns out and often pointed at Perry—directed Perry to open his safe and then to lead them to his "other money." Defendant urges that the carjacking portion of the robbery "cannot count" as part of the duration because there is no evidence that it was part of defendant and Renfroe's "plan." We reject this argument because the evidence suggested that the defendants here—by asking "where is the other money?"—knew Perry would have money beyond that kept in the safe, and that they were ready to do what was needed to obtain that additional money, including traveling elsewhere if it was off-site.

Fourth, there is no evidence that defendant knew of Renfroe's penchant for violence. The trial court did not find any such evidence (and this finding obviates the need to address defendant's argument about whether his association with the street gang means that he knew Renfroe, as a full-fledged gang member, would be prone to violence). However, the absence of a single factor is not dispositive.

Fifth, defendant argues that he had no opportunity to minimize the risk of violence during the burglary and robbery. For the reasons detailed above, we disagree. Indeed, after finding Candela on the floor after being shot, defendant elected to *elevate* the risk of violence by pointing his Uzi at Perry's head to continue the robbery.

### B. *Other considerations*

Defendant contends that the trial court erred by not considering or improperly considering three other factors (since the *Banks* and *Clark* factors are not exclusive).

First, defendant for the first time on appeal argues that the court erred in not considering his relative youth (he was 20 at the

14

time of the crime).  Youth can be a relevant factor in assessing whether a defendant acted with reckless indifference to human life (e.g., *Moore*, *supra*, 68 Cal.App.5th at pp. 453-454 [16-year-old]; *People v. Harris* (2021) 60 Cal.App.5th 939, 944, 960 [17-year-old]; *People v. Keel* (2022) 84 Cal.App.5th 546, 562 (*Keel*) [15-year-old]), but it is not, by itself, a dispositive factor.  (*In re Harper* (2022) 76 Cal.App.5th 450, 470.)  For starters, because defendant did not ask the trial court to consider his age, we lack any evidence beyond the fact of his chronological age (such as any evidence regarding his relative maturity and the like).  But even if we look solely to his age, although defendant was relatively young (at age 20), he was not a juvenile like the defendants in *Moore*, *Harris* and *Keel*; thus, he was not as susceptible to influence by others and, based on age alone, not as immature as those juveniles may have been.  Further, the other factors detailed above counsel fairly strongly in favor of a finding of reckless indifference, such that his age—which, as noted above, is not dispositive by itself—does not countermand the trial court's finding.

Second, defendant argues that the court was wrong to look at the general consideration, espoused in *McDowell*, *supra*, 55 Cal.App.5th at p. 1013, that participating in a home invasion robbery of a drug dealer carries "a particularly high risk of violence," such that engaging in such conduct involves a reckless indifference to human life.  Specifically, defendant urges that there was no evidence that he and Renfroe had personally dealt with Perry in the past.  The absence of evidence of this fact seems to be of no consequence, as defendant believed Perry was a drug dealer—and it is *that fact* that makes him aware of the risk (and indifferent to it by plowing ahead anyway).  Whether they had a

15

longstanding social or business relationship is of no consequence. Defendant also urges that one of the law enforcement witnesses indicated that drug dealers are "entrepreneurs" and "businessmen," but this does not negate the dangerousness they pose in such an entrepreneurial business; indeed, that witness also pointed out that they often—though not always—kill people to stay in business.

Third, defendant cites the longstanding maxim in the cases construing *Banks* and *Clark* that *mere* participation in an armed robbery is not enough to establish reckless indifference to human life (*In re Bennett* (2018) 26 Cal.App.5th 1002, 1026; *Banks*, *supra*, 61 Cal.4th at p. 810; *Clark*, *supra*, 63 Cal.4th at p. 616), but he seems to leap from that proposition to the conclusion that *no level of participation* is enough. However, that is simply an incorrect statement of the law because it would mean that armed robbers are categorically immune from being major participants who act with reckless indifference to human life. By the same token, whether or not the robbery as a whole was a "garden-variety armed robbery" is irrelevant because what matters is *defendant's particular role* in *this particular* armed robbery.

### C.    *Precedent-based arguments*

Throughout his brief, defendant cites a variety of cases where appellate courts have overturned trial court findings of reckless indifference as being analogous to this one. Drawing such analogies is difficult, however, because the finding of reckless indifference turns on a totality of the pertinent factors; pointing to one fact in common ignores the multitude that are not. We have addressed all but one of defendant's proffered analogies above.

16

Defendant specifically urges that this case is so similar to Keel, *supra*, 84 Cal.App.5th 546, that we cannot affirm the trial court's finding of reckless indifference. We disagree. In *Keel*, the 15-year-old defendant and his cohort "unexpected[ly]" bumped into two men on the sidewalk who were looking to buy drugs; the defendant and his cohort spontaneously and without any advance planning decided to rob the man who said he had the money to buy the drugs by pulling out guns and doing a pat-down search of the man with the money; the defendant told the other man to "leave" and "get out of here"; and when the man with the money resisted, the defendant's cohort shot him. (*Id.* at pp. 552-553.) When the defendant was arrested later that day, the revolver in his possession was unloaded. (*Id.* at p. 559.) This case is different. Here, defendant and Renfroe planned a home invasion robbery of Perry's apartment in advance—they asked where Perry lived, brought and donned ski masks, and armed themselves with guns (and Renfroe's gun was real and loaded, because it was the gun he used to shoot Candela). Defendant was not able to stop Renfroe from shooting Candela, but both before and after the shooting held his Uzi to two people's heads and stepped around Candela's body on the floor to put his gun to Perry's head. Defendant was also not a 15-year-old. In sum, *Keel* does not dictate a different outcome in this case.

**DISPOSITION**

The order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ